**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Kevin Smith, Individually and on Behalf of All Other Persons Similarly Situated, ) | **Civil Action No.:** |
| Plaintiffs, ) | |
| v. ) | **CLASS ACTION COMPLAINT** |
| E*TRADE SECURITIES LLC, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY & CO. LLC, and MORGAN STANLEY ) | **JURY TRIAL DEMANDED** |
| Defendants. ) | |

**CLASS ACTION COMPLAINT**

Plaintiff Kevin Smith ("Plaintiff") brings this class action individually and on behalf of all similarly situated persons or entities who maintained E*TRADE Securities LLC ("E*TRADE") or Morgan Stanley Smith Barney LLC ("MSSB" and "E*TRADE from Morgan Stanley") retirement accounts since 2018. In violation of its fiduciary duties and contractual obligations and a regulatory mandate to act only in the "best interests" of its clients and pay all clients a reasonable rate of interest on their cash, Defendants instead ignored benchmark and risk-free interest rates, and paid customer only minimal, near-zero, interest rates, generating hundreds of millions of dollars in profits for defendants and their affiliates.

1.      In short, Plaintiff alleges that defendants E*TRADE and MSSB failed to pay a reasonable interest rate on cash maintained in retirement accounts, as required by the applicable regulations and the contracts between E*TRADE / MSSB and retirement account investors.

2.      In a typical cash sweep program, the brokerage firm automatically moves uninvested cash from the client's retirement account into an interest-bearing account that generates returns for the client.

3.      When E*TRADE and MSSB sweep their retirement clients' cash through its bank cash sweep program, E*TRADE and MSSB use that cash to generate outsized returns for itself, due to the spread between the interest income earned on the cash and the amount of interest paid to clients.

4.      E*TRADE and MSSB agreed to provide retirement clients a "reasonable rate of interest" on the swept cash. The agreement between E*TRADE and its clients carries with it an implied covenant of good faith and fair dealing. That includes an implied promise that neither party will do anything to frustrate the fruits of the clients' bargain with E*TRADE.

5.      In addition, E*TRADE and MSSB are required to act as a fiduciary in the best interests of their retirement clients, including within the scope of its agency relationship with those clients in connection with its cash sweep program. That includes a duty to put its clients' interests ahead of its own when creating and implementing the cash sweep program, as well as recommending and/or making investments or conducting transactions for them, including transactions within the scope of its cash sweep program

6.      However, instead of acting as a fiduciary in the best interests of retirement account holders or fulfilling its contractual and implied covenant obligations to its clients, E*TRADE and MSSB used its clients' funds to enrich itself at their expense.

7.      From the time Plaintiff opened his account, E*TRADE operated as a subsidiary of E*TRADE Financial Corporation. Until roughly October 2023, E*TRADE required that each holder of a retirement account agree to the terms contained in the Retirement Sweep Deposit Account ("RSDA") Program Customer Agreement.

8.      The RSDA Agreement obligated E*TRADE to pay a "reasonable rate of interest" on cash swept from retirement accounts. The RSDA Agreement stated at Section 17: "I authorize such RSDA Program deposits and understand that each Program Bank will pay a reasonable rate of

interest, as contemplated by ERISA Section 408(b)(4) and the regulations under Code Section 4975(d)(4)."[1]

9.    In February 2020, Morgan Stanley and E*TRADE entered into a definitive agreement under which Morgan Stanley would acquire E*TRADE in an all-stock transaction valued at approximately $13 billion.  In October 2020, Morgan Stanley (the Parent Corporation of MSSB) completed the acquisition of 100% of E*TRADE Financial Corporation common stock in a stock-for-stock transaction.

10.    Subsequently, in January 2022, the RSDA Agreement was revised to reflect the firm's updated affiliation post-merger.[2]

11.    On or about September 1, 2023, E*TRADE began the process of transferring accounts, assets and obligations to MSSB. As such, MSSB became the broker-dealer of record and assumed custody of accounts, including retirement accounts, at E*TRADE. Subsequently, the company began operating under the trade name "E*TRADE from Morgan Stanley".[3] E*TRADE began to transfer all eligible sweep options, including the RSDA, into a MSSB bank sweep program called the BDP. As of approximately October 2023, the BDP replaced the RSDA as the default sweep available to retirement accounts at E*TRADE.

12.    E*TRADE from Morgan Stanley subsequently required retirement account holders

---

[1] "RSDA Program Customer Agreement" at "Section 17. Regarding Qualified Plans and Individual Retirement Accounts," available at https://web.archive.org/web/20210128183929/https://us.etrade.com/e/t/prospectestation/pricing?id=1209047000 (last viewed Feb. 6, 2025).

[2] "RSDA Program Customer Agreement" , available at https://web.archive.org/web/20220809064349/https://us.etrade.com/e/t/prospectestation/pricing?id=1209047000 (last viewed Feb. 6, 2025).

[3] References to "E*TRADE from Morgan Stanley" in this Complaint refer to the MSSB product. E*TRADE's transition to "E*TRADE from Morgan Stanley," signified the assumption of responsibility by MSSB for the custody and clearing services previously provided by E*TRADE.

to agree to the terms contained in the Morgan Stanley Bank Deposit Sweep Program ("BDP") Disclosure Statement. Additionally, retirement account holders were required to consent to one of three E*TRADE from Morgan Stanley individual retirement account ("IRA") disclosure statements associated with their respective accounts: (i) the Individual Retirement Plan and Traditional IRA Disclosure Statement; (ii) the Roth IRA Plan Document & Disclosure Statement; or (iii) the SIMPLE IRA Plan Document & Disclosure Statement (collectively referred to as the "2023 IRA Disclosures").

13.    The 2023 IRA Disclosures each state that the Participant authorizes the deposit or investment of cash balances in the respective account in "deposit accounts with Morgan Stanley Bank, N.A. and/or any other banking affiliate of the Custodian that bear a reasonable rate of interest."

14.    E*TRADE breached the terms of the RSDA Agreement and neglected to provide investors with a reasonable rate of interest on cash in retirement accounts.

15.    Rising interest rates presented an opportunity for E*TRADE clients to earn more on their cash sweep account balances. But, by improperly keeping the interest rates paid on bank cash sweep accounts artificially low, E*TRADE took advantage of that opportunity for itself, at the expense of its clients, using its clients' cash for its own benefit and earning outsized returns year after year.

16.    E*TRADE from Morgan Stanley breached, and continues to breach, the terms the 2023 IRA Disclosures, failing to pay investors a reasonable rate of interest on cash in retirement accounts.

17.    As market interest rates rose in 2022 and into 2023, E*TRADE and E*TRADE from Morgan Stanley alike, paid investors with up to $499,999 of deposit balances only 0.01% APY (annual percentage yield) interest on their cash. This is approximately 500 times lower than the

contemporaneous federal funds rate and is equivalent to $1 of interest on $10,000 in cash per year. IRA investors with greater deposit balances fared only modestly better. Investors with $500,000 to $999,999 in deposit balances were paid a high of only 0.05% APY, and IRA investors with greater than $1 million in AUM were paid a high of only 0.15% APY, as of July 29, 2022, through to the date of filing this Complaint.

18.     From March 2022 onwards, when the Federal Reserve began raising the target federal funds rate, the reasonable value of swept cash consistently exceeded the amounts paid by E*TRADE and E*TRADE from Morgan Stanley on sweep accounts. Comparable brokerages such as Fidelity Investments, R.W. Baird, Robinhood, and Vanguard Investments, which did not sweep cash to affiliated banks, but rather swept cash to independent, unaffiliated banks, paid substantially higher rates on swept cash, than E*TRADE and E*TRADE from Morgan Stanley. For example, Fidelity paid retirement investors as much as 2.72% APY on swept cash regardless of AUM, starting in August 2023, and R.W. Baird paid retirement investors between 2.07% to 4.15% on swept cash, depending on cash balances, as of September 8, 2023.

19.     In comparison, E*TRADE and E*TRADE from Morgan Stanley consistently paid among the lowest rates on swept cash among brokerages irrespective of whether these brokerages swept cash to affiliated or unaffiliated banks.

20.     E*TRADE has kept sweep interest rates essentially unchanged over the past several years, ignoring current market conditions in which interest rates rose significantly. For example, the yield on short-term U.S. Treasury bills increased dramatically over the past two years, even rising above 5% for extended periods of time. By contrast, E*TRADE pays (and has for years paid) an interest rate of 0.01% to many of its clients with cash sweep accounts, a rate that has remained unchanged since 2020. For context, that is approximately *1/500th* of that short-term Treasury Bill rate. There rates are neither fair nor "reasonable."

21.     Multiple metrics, including (i) the federal funds ("FF") rate, and rates paid by (ii) online banks, and on (iii) Morgan Stanley Premium Savings accounts, and (iv) government money market funds, demonstrate that the near-zero rates paid by E*TRADE and E*TRADE from Morgan Stanley on retirement sweep accounts were not reasonable.

22.     Defendants made materially misleading statements to customers about their sweep program and failed to disclose that Defendants established and used the sweep program to enrich themselves by paying unreasonably low interest rates to customers to increase Defendants' financial benefits from the Sweep Program.

23.     Defendants' material statements and omissions regarding their sweep program, and use of their sweep program to enrich themselves by paying unreasonably low interest rates to customers, violated federal law, and breached their fiduciary duties and contractual obligations to customers.

24.     Plaintiffs seek both monetary recovery commencing on January 1, 2018 and declaratory and injunctive relief. E*TRADE from Morgan Stanley is committing an ongoing wrong. Accordingly, the class period for which plaintiffs seek relief is ongoing and includes continuing and future retirement account investors.

## PARTIES

25.     Plaintiff Kevin Smith is domiciled in Illinois and maintains both a retirement account and a traditional brokerage account with E*TRADE.

26.     Defendant E*TRADE Securities LLC is a Delaware corporation with its principal place of business located in Jersey City, New Jersey. E*TRADE is a registered broker-dealer, member of the Securities Investor Protection Corporation ("SIPC"), and a wholly owned subsidiary of E*TRADE Capital Management, LLC ("ETCM"), which is an indirect subsidiary of Morgan Stanley. E*TRADE operated as a subsidiary of E*TRADE Financial Corporation from the

beginning of the Class Period until E*TRADE Financial Corporation's acquisition by Morgan Stanley on October 2, 2020.

27.    Defendant MSSB is a limited liability company whose sole member is Morgan Stanley Domestic Holdings LLC, which is a limited liability company whose sole member is Morgan Stanley Capital Management LLC.  Morgan Stanley Capital Management LLC is a limited liability company whose sole member is Morgan Stanley, which is incorporated under the laws of the State of Delaware and has its principal place of business in the State of New York.  In 2023, MSSB assumed the responsibility of the custody and clearing services previously provided by E*TRADE, and the investment advisory services provided by ETCM.

28.    MSSB, operates through E*TRADE by Morgan Stanley, the BDP, among other things, which automatically deposits, or "sweeps" cash into interest-bearing FDIC-insured deposit accounts established by, and in the name of, MSSB as agent and custodian, at one or more sweep banks: Morgan Stanley Bank, N.A. ("MSBNA") and Morgan Stanley Private Bank, N.A. ("MSPBNA").[4] The sweep program, as it applies to retirement accounts, is governed by one of the three 2023 IRA Disclosures. Previously, E*TRADE offered an equivalent to the BDP sweep program, the RSDA, which was governed by the RSDA Agreement.

## JURISDICTION AND VENUE

29.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(d)(2).  Plaintiff is diverse from Defendants and the amount in controversy in this putative class action exceeds $5 million.

30.    This Court has personal jurisdiction over Defendants because they conduct substantial business in this District and E*TRADE has its principal places of business here.

31.    Venue is proper in this District under 28 U.S.C. § 1391(b), as a substantial portion

---

[4] https://us.etrade.com/l/f/agreement-library/summary-of-bdp

of the acts, omissions, and conduct complaint of occurred in this District.

### DEFENDANTS' SWEEP ACCOUNT MISCONDUCT

32.    A "sweep program" is a service provided by a financial institution where it offers to its customer the option to automatically transfer free credit balances in the securities account of the customer to either a money market mutual fund product or an account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation. *See* 17 CFR 240.15c3-3(a)(17).

33.    Sweep programs are an important source of capital for banks, enabling them to use the cash balances of customer deposits for various corporate purposes. This includes activities such as making loans or investing in government securities. The disparity between the interest rate paid and the interest rate earned by a bank on those deposits is commonly referred to as the net interest margin ("NIM").

34.    NIM is a significant source of income for E*TRADE. E*TRADE generates interest income through its sweep programs.

35.    Defendants make more money when customers' funds are invested in Defendants sweep program rather than in similar cash options and equivalents.  When customers' funds are invested in the Defendants' sweep program, Defendants (and their affiliates) pays and/or secures rates of interest on the customer's cash balances that are neither reasonable nor in compliance with its legal duties.

36.    E*TRADE is a financial service company that provides brokerage accounts and retirement accounts along with related products and services for its clients.

37.    Plaintiff is an individual who has maintained a brokerage account with E*TRADE for approximately two decades, and opened a retirement account with E*TRADE in 2018.

38.    Defendants offer a sweep program for customers, including retirement customers like Plaintiff.

39.     Plaintiff opened his retirement account electronically, by scrolling through electronic screens and acknowledging consent to the various agreements provided online by E*TRADE.

40.     To the best of his recollection, Plaintiff was required to acknowledge the terms of the RSDA Agreement. The RSDA served as the default sweep vehicle for retirement accounts since at least 2018.

41.     As per the contractual terms outlined in the RSDA Agreement, E*TRADE was bound to offer retirement account investors a reasonable rate of interest on the cash swept through the program: "I authorize such RSDA Program deposits and understand that each Program Bank will pay a reasonable rate of interest, as contemplated by ERISA Section 408(b)(4) and the regulations under Code Section 4975(d)(4). [5]

42.     RSDA, E*TRADE's cash sweep program for its retirement account holders, automatically deposited clients' available cash balances into affiliated banks.

43.     E*TRADE serves as its customers' agent, and has control and discretion over the specific banks to which it sweeps customers' cash.

44.     E*TRADE also has complete control over setting the interest rates that are paid on customers' cash balances.

45.     In February 2020, Morgan Stanley and E*TRADE Financial Corporation announced that they had entered into a definitive agreement under which Morgan Stanley would acquire E*TRADE Financial Corporation in an all-stock transaction valued at approximately $13 billion. In October 2020, Morgan Stanley announced that it had completed its planned acquisition.

46.     On January 1, 2022, E*TRADE Savings Bank merged with and into E*TRADE

---

[5] "RSDA Program Customer Agreement" at "Section 17. Regarding Qualified Plans and Individual Retirement Accounts," available at https://web.archive.org/web/20210128183929/https://us.etrade.com/e/t/prospectestation/pricing?id=1209047000 (last viewed Feb. 6, 2025).

Bank, and subsequently E*TRADE Bank merged with and into MSPBNA, with MSPBNA as the surviving bank.

47.    On January 1, 2022, E*TRADE published an updated RSDA Agreement to reflect that the affiliated Program Banks were now MSBNA and MSPBNA. The updated agreement continued to maintain that E*TRADE was contractually obligated to offer retirement account investors a reasonable rate of interest: "I authorize such RSDA Program deposits and understand that each Program Bank will pay a reasonable rate of interest, as contemplated by ERISA Section 408(b)(4) and the regulations under Code Section 4975(d)(4).[6]

48.    On or about September 1, 2023, E*TRADE began the process of transferring accounts, assets and obligations to MSSB. This marked MSSB's transition as the broker-dealer of record, assuming custody of accounts, including retirement accounts, at E*TRADE. The "Important Update About Your E*TRADE Account" document dated June 2023, stated that, from this point, "[n]ew Morgan Stanley retirement account documents will govern, not those of E*TRADE".[9] Additionally, the document informed retirement investors, "[i]f your current Sweep Option is the Retirement Sweep Deposit Account Program ("RSDA"), your balances will be transferred to BDP on or about September 1, 2023."[10] E*TRADE, administered by MSSB, adopted the operating name "E*TRADE from Morgan Stanley".

49.    E*TRADE from Morgan Stanley subsequently requires retirement account holders to agree to the terms contained in the Morgan Stanley BDP Disclosure Statement, in addition to one of three IRA Disclosures based on the specific account type. Holders of a Traditional IRA, Simplified Employee Pension Account ("SEP IRA"), Salary Reduction Simplified Employee

---

[6] RSDA Program Customer Agreement, Effective January 2022 at Section 17. Regarding Qualified Plans and Individual Retirement Accounts.
https://web.archive.org/web/20220809064349/https://us.etrade.com/e/t/prospectestation/pricing?id=1209047000

Pension Account ("SAR-SEP IRA"), Rollover IRA, Spousal IRA, Inherited IRA and/or Rollover IRA Combined Account are required to consent to the E*TRADE from Morgan Stanley Individual Retirement Plan and Traditional IRA Disclosure Statement, dated January 2023, which states that "[t]he Participant authorizes the deposit or investment of cash balances in the "Account" in: (a) deposit accounts with Morgan Stanley Bank, N.A. and/or any other banking affiliate of the Custodian that bear a reasonable rate of interest". Holders of a Roth IRA are required to consent to the Roth IRA Disclosure and holders of a SIMPLE IRA are required to consent to the SIMPLE IRA Disclosure. All three of the 2023 IRA Disclosures contain an identical reasonable rate provision.[7]

50.    The Summary of the BDP acknowledges that E*TRADE from Morgan Stanley has a conflict of interest in sweeping cash to an affiliated entity.

51.    The E*TRADE from Morgan Stanley Client Agreement for Self-Directed Accounts, dated January 3, 2023, acknowledges that Morgan Stanley sets the rate of interest offered in the sweep program: "Interest paid in the BDP or Cash Balance Program is calculated using the interest rates, calculation methodology, and compounding frequency set by Morgan Stanley, which are subject to change by us from time to time without prior notice."[8]

52.    The Client Agreement adds that "[e]xcept for the statute of limitations applicable to claims, this Self-Directed Account Agreement is governed by the laws of the State of New York."

53.    The SEC, in its Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Conflicts of Interest, issued August 3, 2022, emphasized that "cash sweep programs" are a "common source[ ] of conflicts of interest.[9]

54.    Section 4975 of the Internal Revenue Code (entitled "Tax on Prohibited

---

[7] *See* https://us.etrade.com/l/f/agreement-library/ira-plan-documents; https://us.etrade.com/l/f/agreement-library/roth-ira-plan-documents; https://us.etrade.com/l/f/agreement-library/simple-ira-plan-documents.
[8] https://us.etrade.com/l/f/agreement-library/client-agreement.
[9] https://www.sec.gov/tm/iabd-staff-bulletin-conflicts-interest.

Transactions"), referenced in the RSDA Agreements, IRA Disclosures and the Client Agreement for Self-Directed Accounts apply to IRAs generally. See 26 U.S.C. §4975(e)(1)(B) (defining "plan" to include "an individual retirement account described in [IRC] Section 408(a)").

55.     IRC §4975(c)(1)(B) defines as a "prohibited transaction" the "lending of money or other extension of credit between a plan [i.e., an individual IRA] and a disqualified person."

56.     The definition of a "disqualified person," under Section 4975(e)(2) includes, among others, "a person providing services to the plan." MSBNA, MSPBNA, E*TRADE Bank and E*TRADE Savings Bank, are "disqualified person[s]" under Section 4975(e)(2). Thus, the sweep agreement for retirement accounts between Plaintiffs and E*TRADE referenced in the RSDA Agreement, and between Plaintiffs and E*TRADE from Morgan Stanley referenced in the BDP Disclosure and 2023 IRA Disclosures are "prohibited transaction[s]" under §4975(c)(1)(B). E*TRADE acknowledged as much in its reference to IRC §4975(d)(4) in the RSDA Agreement.

57.     IRC §4975(d)(4) provides several "exemptions," or safe harbors, for otherwise "prohibited transactions," one of which is "the investment of all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank or similar financial institution."

58.     Section 4975 recognizes that, even in markets for financial services generally characterized by vigorous competition, related party transactions into which customers are defaulted can offer rates at risk of being depressed by an inherent conflict of interest. Accordingly, conflicted transactions such as affiliated entity cash sweeps are required to pay a reasonable rate of interest. In particular, retirement account customers are vulnerable to receiving inadequate compensation for the use of uninvested cash in their accounts. IRC Section 4975 thus seeks to ensure related party transactions involving retirement accounts are priced at fair market rates.

59.     Similarly, ERISA Section 408(b)(1) exempts from prohibition various interested party transactions that "bear a reasonable rate of interest," among other requirements. See 29 U.S.C.

§1108(b)(1).

60.    To protect investors because of the conflict of interest and in light of the Internal Revenue Code and ERISA provisions addressing that conflict of interest with respect to retirement accounts, the 2023 IRA Disclosures obligate E*TRADE from Morgan Stanley to pay retirement account investors a reasonable rate of interest on cash swept to the affiliated banks. Similarly, under the RSDA Agreement, E*TRADE was obligated to provide retirement account investors with a reasonable rate of interest on cash swept to affiliated banks to ensure investor protection.

61.    E*TRADE from Morgan Stanley fails to differentiate in the interest rate paid based on the reasonable rate provision and pays the same rates of interest on retirement accounts as it pays on non-retirement sweep accounts.[10]

62.    Similarly, E*TRADE neglected to differentiate interest rates based on the reasonable rate provision, offering the same rates on both retirement and non-retirement sweep accounts. While providing an alternative to the RSDA for non-retirement accounts through the Extended Sweep Deposit Account ("ESDA") Program, E*TRADE failed to fulfill its statutory obligation to pay a reasonable rate of interest on retirement account cash, maintaining identical interest rates for both the RSDA and ESDA.

63.    Regulations promulgated by the Department of the Treasury confirm that the cash swept to MSBNA, MSPBNA, E*TRADE Bank and E*TRADE Savings Bank is a "prohibited transaction" but would be permissible (i.e., be within the exemption or safe harbor) if it paid "a reasonable rate of interest." Thus, Treasury regulations state that "Section 4975(d)(4) exempts from the excise taxes imposed by section 4975 investment of all or a part of a plan's assets in deposits bearing a reasonable rate of interest in a bank or similar financial institution…, even though such

---

[10] See "Morgan Stanley Bank Deposit Program Disclosure Statement" at p. 2.
https://www.morganstanley.com/wealth-disclosures/pdfs/BDP_disclosure.pdf.

bank or similar financial institution is a fiduciary or other disqualified person with respect to the plan." 26 C.F.R. §54.4975-6(b)(1).

64.     Treasury regulations also mandate that when a financial institution "invests plan assets in deposits in itself or its affiliates under an authorization contained in a plan or trust instrument," the authorization "must name" the institution and "must state that [it] … may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)." Id. §54.4975-6(b)(3).

65.     A March 15, 2017 letter to the Department of Labor from the American Bankers Association, states that with respect to the investment of IRA assets into "one or more bank deposit products, ... banks have routinely relied on the statutory exemption [for prohibited transactions] available for bank deposit product programs under Section 4975(d)(4) of the Code…."[11] In support of this contention, the ABA attached a white paper from Morgan, Lewis & Bockius LLP, which (at 4) specifically notes that a bank may "invest an IRA's assets in its own deposit accounts" "which bear a reasonable interest rate" pursuant to the exemption "found in Section 4975(d)(4) of the Code and Section 408(b)(4) of ERISA." Defendants recognize that their sweep programs constitute conflicted, presumptively prohibited transactions that are only permitted if depositors are receiving a "reasonable" rate of interest.

66.     Section 4975 and ERISA Section 408 place the burden of demonstrating reasonableness on the financial institution. The principle underlying the reasonable rate provisions—that conflicted transactions, while prohibited, can be made lawful if the "disqualified person" can sustain their burden of proof that the terms were "reasonable"—is consistent with the well-settled common law principle (in the corporate context, trust context, or otherwise) that a

---

[11] https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/rules-and-regulations/public-comments/1210-AB79/00937.pdf

defendant can escape liability arising from its conflict of interest if it can show the challenged action is "entirely fair" to the beneficiary. Consistent with the common law, the reasonable rate provisions impose on E*TRADE and E*TRADE from Morgan Stanley the burden of demonstrating that the prohibited transaction is nonetheless reasonable.

67.    Other brokerages acknowledge that they are required to pay reasonable rates only on retirement accounts, and that that obligation derives from ERISA Section 408(b)(4) and Internal Revenue Code Section 4975(d)(4).

68.    Rates paid on swept cash at E*TRADE and E*TRADE from Morgan Stanley are based on tiers as determined by "the value of total deposit balances in the account.

69.    According to the E*TRADE website, E*TRADE from Morgan Stanley currently (as of February 6, 2025) offers eight interest rate tiers. The lowest six account tiers: $0-$4,999, $5,000-$24,999, $25,000-$49,999, $50,000-$99,999, $100,000-$249,000 and $250,000-$499,999, yield 0.01% interest. Deposit balances of $500,000-$999,999 yield 0.05% interest on swept cash. Deposit balances of $1,000,000 and above yield 0.15% interest on swept cash.[12]

70.    While these rates change over time, the RSDA and sweep programs offered by Defendants have paid .01% interest on all accounts with less than $500,000 throughout the relevant period.

71.    The rates paid Defendants to their customers pursuant to the BDP violate Defendants' duties to their customers because these rates are not reasonable, and constitute a breach of Defendants' fiduciary and contractual duties to their customers in violation of federal regulations. *See* 17 CFR § 240.151-1 (2019).

72.    The Sweep Program documents provide that Defendants acts as agent for customers in the Sweep Program.

---

[12] https://us.etrade.com/l/options-uninvested-cash/sweep-rates.

73.     The Sweep Program provides several highly lucrative financial benefits to Defendants and their Bank Affiliates. Defendants receive payments from the affiliates on a per account basis for each account that sweeps to one of their affiliates relating to offering and supporting the Cash Sweep Program.

74.     Defendants also receive a stable, source of funding that is used to fund current and new lending, investment, and other business activities.

75.     Due to this adverse financial incentive, Defendants fail to pay reasonable interest rates to most Sweep Program customers and instead pay miniscule, near-zero rates ranging from 0.01% to 0.15% depending on the amount deposited. By comparison, Defendants' competitors pay far higher rates (more than 400x higher) to customers in their own cash sweep programs. For example, competitor Moomoo's rate is 4.1%, Webull's rate is 3.75%, and Vanguard's rate is 3.65%.[13]

76.     Indeed, during times of increased interest rates, E*TRADE and MSSB did not pay clients a fair or reasonable rate of interest on their swept cash. For example, since 2022, the Federal Funds Rate – the interest rate at which banks lend to one another – increased significantly from a low of 0.08% to a high of 5.33% in 2024. However, E*TRADE kept paying retirement customers near zero interest rates and kept the profits for itself and its affiliates.

77.     Reg. BI applies to investors, defined as "a natural person, or the legal representative of such person who (i) [r]eceives a recommendation of any securities transaction or investment strategy" and "(ii) [u]ses the recommendation primarily for personal, family, or household purposes." 17 C.F.R. § 240.15l-1(b)(1).

78.     Defendants failed to act in its customers' best interest because the interest rates that

---

[13] *See* https://www.moomoo.com/us/invest/cashsweep; https://www.webull.com/trading-investing/cash-management; https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account

they paid their customers were unreasonable compared to the far higher market rates paid by competitors.

79.    Defendants made material omissions by failing to disclose that, as discussed above, Defendants established and used the Sweep Program to enrich themselves by paying unreasonably low interest rates to customers in order to increase Defendants' financial benefits from their sweep programs

80.    The BDP disclosure states that the interest rates applicable to swept cash "may be higher or lower than the interest rates available on other deposit accounts offered by a Sweep Bank or on deposit accounts offered by other depository institutions." These statements were misleading and omitted material facts because, in reality, the Deposit Account interest rates were *always* significantly below market interest rates available on other deposit-type accounts and cash alternatives.

81.    For customer cash balances maintained in retirement accounts (regardless of whether the accounts are advisory or brokerage in nature), Defendants may utilize those cash balances for investments or loans but only if it pays the customer a "reasonable rate" of interest on those cash balances.

82.    In August 2018, the federal funds target rate was 1.75% - 2.00% and fluctuated only slightly thereafter, reaching a high of 2.25% - 2.50% on May 1, 2019. Throughout this period E*TRADE offered their lowest tier of investors between 0.01% and 0.05% interest on swept retirement cash. E*TRADE offered their highest tier of investors between 0.01% interest and 0.45% interest on swept retirement cash.

83.    From May 2019 onwards, rates continued to fluctuate, falling slowly to 1.00% - 1.25% on March 30, 2020, before market interest rates fell to essentially zero.

84.    During a period when interest rates were generally on the rise in tandem with

increases to the Federal Funds rate, E*TRADE and E*TRADE from Morgan Stanley maintained disproportionately low interest rates on swept cash in retirement accounts. Beginning in March 2022, the federal funds target rate began to gradually rise from 0.00 – 0.25% to 0.25 - 0.50% on March 17, 2022 and ending 2022 at 4.25 - 4.50%. As of January 12, 2024, the federal funds target rate was 5.25% - 5.50% and the effective federal funds rate as published by the Federal Reserve Bank of New York rate was 5.33%.

85.     By contrast, the RSDA rates concluded 2022 at 0.01% for account balances up to $499,999, 0.05% for balances between $500,000 and $999,999, and 0.15% for balances of $1,000,000 and above.

86.     Despite the prevailing market trends, interest rates at E*TRADE by Morgan Stanley have remained stagnant. As of February 6, 2026, the interest rates on retirement cash, although now under the BDP and administered by MSSB, have seen no increase, remaining at 0.01% for account balances up to $499,999, 0.05% for balances between $500,000 and $999,999, and 0.15% for balances of $1,000,000 and above.

87.     A reasonable rate of interest is the rate that would result in a competitive market under fair market valuation conditions, i.e. a rate parties would agree to in an arm's length transaction where neither party was able to exert market power over the other.

88.     Fair market value is defined by the IRS as: "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." 26 C.F.R. § 25.2512-1.

89.     Consistent with the common-sense, plain meaning of reasonableness, which means fair, a reasonable rate pursuant to IRC §4975 as mandated under E*TRADE's RSDA and E*TRADE from Morgan Stanley's 2023 IRA agreements, is one that takes into account other market rates for similar albeit not identical products in arm's-length transactions.

90.    Three-month treasury bills, an instrument the Department of Labor has advised should be considered in determining a reasonable interest rate, rose in yield from 0.046% as of January 1, 2022 to 5.394% as of January 9, 2024.

91.    Money market fund rates also provide a benchmark for determining what does or does not constitute a "reasonable rate."

92.    E*TRADE was financially motivated to default its customers into its low-paying cash alternatives and RSDA rates were set unilaterally by E*TRADE Bank and E*TRADE Savings Bank until 2022 to maximize net income to those banks.

93.    E*TRADE from Morgan Stanley continues to exhibit these financial motivations. E*TRADE from Morgan Stanley maintains in its retirement brokerage accounts hundreds of millions if not billions of dollars in cash. BDP rates are set unilaterally by MSBNA and MSPBNA to maximize net income, and by taking advantage of retail investors, who--either due to lack of sophistication or lack of time in constantly moving cash made available from dividend payments and the like into higher-yielding money market investments—are what industry insiders refer to as a "rate insensitive" population. Unlike large institutions, retail retirement account investors are usually the constituency least likely to punish brokerages for underpaying them on excess cash.

94.    Because of the stickiness of retail deposit accounts such as IRA accounts, swept deposits are a valuable deposit franchise for brokerage businesses.

95.    Morgan Stanley benefits in the hundreds of millions of dollars (if not more) from the NIM spread between the rate E*TRADE from Morgan Stanley pays its retirement customers and the rate at which MSBNA and MSPBNA can lend to borrowers or otherwise invest cash deposits.

96.    Previously, E*TRADE Financial Corporation benefited from the NIM spread between the rate E*TRADE paid its retirement customers and the rate at which E*TRADE Bank and E*TRADE Savings Bank could lend to borrowers or otherwise invest cash deposits.

97.    E*TRADE from Morgan Stanley and E*TRADE have a conflict of interest in connection with offering cash sweep options to customers because they have both benefitted from paying below market rates on deposits being held by their affiliated banks.

98.    E*TRADE from Morgan Stanley and its predecessor, E*TRADE, implemented profit-maximizing pricing strategies. The sweep rates, unilaterally set by MSBNA and MSPBNA for E*TRADE from Morgan Stanley, and by E*TRADE Bank and E*TRADE Savings Bank for E*TRADE, were inconsistent with the fair market value standard and were not presumptively reasonable rates.

99.    The profitability of this practice is overwhelmingly apparent for E*TRADE from Morgan Stanley's affiliate banks, MSPBNA and MSBNA. Morgan Stanley's acquisition of E*TRADE was motivated by this practice, and allowed Morgan Stanley to generate interest income by sweeping billions of dollars from E*TRADE.

100.    Other brokerages that swept cash to unaffiliated banks set rates between brokerages and banks resulting from something that more closely resembles arm's-length negotiations. For example, Fidelity Investments and R.W. Baird do not sweep cash to affiliated banks, and have consistently paid substantially higher rates of interest than E*TRADE, E*TRADE from Morgan Stanley and other brokerages that sweep cash to affiliated banks.

101.    At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of tier, and R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on cash balances above $5 million). E*TRADE, on the other hand, paid 0.01% interest (on cash balances up to $499,999) and 0.15% interest (on cash balances above $5 million).

102.    The federal funds target rate continued to increase in 2023 hitting an effective yield of 5.33% on July 27 2023. Similarly, Fidelity and R.W. Baird continued to increase the rates it paid on swept cash, which continues to the present. As of January 12, 2024, Fidelity paid 2.69% interest

on cash balances regardless of tier, and R.W. Baird paid between 2.03% interest (on cash balances up to $1 million) and 4.11% interest (on cash balances above $5 million). In comparison, E*TRADE from Morgan Stanley continued to pay 0.01% (on cash balances up to $499,999) and 0.15% (on cash balances above $5 million).

103.   The rates set by Fidelity and R.W. Baird at arm's-length are evidence of the fair market or reasonable rates based on business and economic conditions. The rates set by E*TRADE and E*TRADE by Morgan Stanley, by default, in self-interested transactions, are not reasonable rates.

104.   However, Defendants swept cash to affiliated banks, who had a conflict of interest and profited from paying low rates, and continue to pay low rates of interest on FDIC-insured sweep accounts.

105.   The rates paid by E*TRADE and E*TRADE from Morgan Stanley on retirement accounts are also unreasonable compared to rates paid on government money market funds.

106.   A money market mutual fund is "income producing, low risk, and liquid," and an appropriate capital preservation alternative for use in retirement accounts. See 29 CFR § 2550.404c-1(b)(2)(ii)(C)(2)(ii).

107.   Academic literature supports the equivalence of MMFs and FDIC-insured accounts. For example, Federal Reserve economists Afonso et al. (2023) state that MMFs and bank deposits are "close substitutes from an investor's perspective."

108.   Brokerages that sweep cash to money market mutual funds pay substantially higher rates of interest than E*TRADE, E*TRADE from Morgan Stanley and other brokerages that sweep cash to affiliated banks. For example, in 2022-23 Fidelity Investments swept cash into its Fidelity Government Money Market Fund (SPAXX) and Vanguard Investments swept investors cash into its Vanguard Federal Money Market Fund (VMFXX). Both government money markets consist of

at least 99.5% U.S. government or agency securities backed by the full faith and credit of the U.S. government. Both Fidelity and Vanguard government money market funds have minimal risk that is equivalent to FDIC-insured accounts. See 17 C.F.R. 270.2a-7(a)(11).

109.    E*TRADE from Morgan Stanley acknowledges on its that FDIC-insured deposit accounts and MMFs can be used interchangeably as sweep options. E*TRADE from Morgan Stanley offers investors two money market funds as part of the BDP (these are affiliated with Morgan Stanley): MGPXX and DWGXX. Retirement account deposit balances of above $20 million are swept, without limit, to MGPXX. Retirement investors with less than $20 million in deposit balances, are not permitted to purchase MMFs.

110.    The substantially higher yields offered by MMFs as sweep options is strong evidence that the rates paid by E*TRADE and MSSB on swept retirement cash are not reasonable.

## CLASS ACTION ALLEGATIONS

111.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf all persons who had retirement accounts with cash deposits or balances with Defendants beginning January 1, 2018.

112.    Plaintiff reserves the right to amend the Class definition if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

113.    Excluded from the Class are E*TRADE, Morgan Stanley, and any of their affiliates, legal representatives, employees, or officers; the judicial officer(s) and any judicial staff overseeing this litigation; and counsel for Plaintiff and the proposed Class and Subclass, including other attorneys and staff at each respective firm.

114.    Each of the elements of Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) are established.

115.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Plaintiffs at this time

and can only be ascertained through appropriate discovery, E*TRADE and MSSB maintained billions of dollars of cash balances nationwide. Plaintiffs conclude that there are thousands of members of the Class. Record owners and other members of the Class may be identified from records maintained by E*TRADE and MSSB and may be notified of the pendency of this action by email or publication.

116.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by E*TRADE's and MSSB's wrongful conduct complained of herein.

117.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class litigation.

118.    E*TRADE and MSSB have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

119.    Common issues of law or fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the common issues of law or fact that will predominate include:

     a.  whether Defendants violate the laws as alleged herein

     b.  whether Defendants owe fiduciary duties to members of the Class in connection with their sweep programs

     c.  whether Defendants breached their fiduciary duties to members of the Class in connection with their sweep programs

     d.  ii. Whether E*TRADE or MSSB or Plaintiffs have the burden of proving the reasonableness of E*TRADE's rates of interest.

     e.  Whether Defendants fail to pay depositors a reasonable rate of interest on cash

balances maintained in retirement brokerage accounts

f.  Whether Defendants made material omissions and/or misrepresentations regarding their sweep programs

g.  Whether the Class sustained damages as a result of the alleged wrongful conduct, and if so, the appropriate measure of damages.

120.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action

## COUNT I

## BREACH OF CONTRACT

121.  Plaintiff repeats and realleges each of the allegations set forth in the paragraphs 1-120 as if fully set forth herein.

122.  E*TRADE and MSSB are contractually obligated to provide Plaintiffs and Class Members with "a reasonable rate of interest" on retirement cash assets.

123.  Plaintiffs and Class members have performed their contractual obligations.

124.  E*TRADE and MSSB, in breach of their contractual obligations, failed to pay Plaintiffs and Class Members a "reasonable rate" on cash assets.

125.  Plaintiffs and other Class Members have been and continue to be injured from E*TRADE and MSSB's breach of the contract requiring it to pay a "reasonable rate" on cash.

## COUNT II

## BREACH OF FIDUCIARY DUTY

126.    Plaintiff repeats and realleges each of the allegations set forth in the paragraphs 1-120 as if fully set forth herein.

127.    Defendants owed fiduciary duties to Plaintiff and the Class, including a duty to act in the best interests of, and deal fairly and honestly with, Plaintiff and the Class.

128.    Defendants violated their duty to act in the best interests of Plaintiff and the Class by using their sweep programs to enrich themselves at the expense of customers who were paid unreasonably low interest rates, as described above.

129.    Defendants also violated their duty to deal fairly and honestly with Plaintiff and the Class by making material misrepresentations and omissions in their account documents and disclosures.

130.    Further, Defendants violated their duty to act with reasonable care to verify the truthfulness of the information set forth in the Sweep Program, which were materially misleading and omitted material facts.

131.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and the Class have suffered damages and are entitled to recover such damages from Defendants.

## COUNT III

## NEGLIGENT MISREPRESENTATIONS AND OMISSIONS

132.    Plaintiff repeats and realleges each of the allegations set forth in the paragraphs 1-120 as if fully set forth herein.

133.    Defendants were the agent of customers enrolled in their sweep programs, including Plaintiff and the Class.

134.    Defendants owed Plaintiff and the Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Sweep Program.

135.    Defendants negligently made material misrepresentations and omissions in the account documents and disclosures, as described above.

136.    Plaintiff and the proposed Class justifiably relied on the account documents and disclosures and accordingly deposited and maintained cash balances in the Sweep Program to their detriment.

137.    Defendants' material misrepresentations and omissions directly and proximately caused harm to Plaintiff and the members of the proposed Class.

**COUNT IV**

**VIOLATION OF NEW YORK GBL SECTION 349**

138.    Plaintiff repeats and realleges each of the allegations set forth in the paragraphs 1-120 as if fully set forth herein.

139.    Defendants selected New York law as the law governing their account agreements.

140.    Defendants' acts and practices with respect to their sweep programs, as described above, constitute unlawful, unfair, misleading, and deceptive business acts and practices in violation of Section 349 of New York's General Business Law ("GBL").

141.    Defendants' misleading and deceptive business acts and practices with respect to their sweep programs adversely impacted Plaintiff and the Class, and therefore constitute consumer-oriented conduct under GBL §349, which resulted in direct harm to Plaintiff and the Class.

142.    Accordingly, Plaintiff and the Class seek appropriate relief under GBS §349, including injunctive relief and damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A. Certifying the proposed class pursuant to Rule 23 of the Federal Rules of Civil Procedure

and Plaintiff's counsel as Class Counsel for the proposed Class;

B.  Awarding compensatory damages in favor of Plaintiff and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Awarding Plaintiff and Class and Subclass members restitution, disgorgement of profits, and forfeiture of compensation

D.  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

E.  Ordering rescission of the account agreements and restitution of all fees and other benefits received by Defendants thereunder; and

F.  Such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on behalf of himself and the proposed class on all issues so triable.


DATED: February 13, 2025                    Respectfully submitted,

                                            */s/ Christopher A. Seeger*
                                            Christopher A. Seeger
                                            David R. Buchanan
                                            Caleb Seeley
                                            **SEEGER WEISS LLP**
                                            55 Challenger Road, 6th Floor
                                            Ridgefield Park, New Jersey 07660
                                            Telephone: (973) 639-9100
                                            Facsimile: (973) 639-9393
                                            cseeger@seegerweiss.com
                                            dbuchanan@seegerweiss.com
                                            cseeley@seegerweiss.com

                                            *Attorneys for Plaintiff and*
                                            *the proposed class*